Argued and submitted November 15, 1982, affirmed in part, reversed in part
February 2, 1983

In the Matter of the Compensation of
Christine Nelson Givens, Claimant.

GIVENS,

*Petitioner - Cross-Respondent,*

*v.*

STATE ACCIDENT INSURANCE FUND
CORPORATION,

*Respondent - Cross-Petitioner.*

(Nos. 80-05753, 80-07341; CA A24491)

658 P2d 526

Richard T. Kropp, Albany, argued the cause for petitioner - cross-respondent. With him on the briefs was Emmons, Kyle, Kropp & Kryger, Albany.

Darrell E. Bewley, State Accident Insurance Fund, Salem, argued the cause and filed the brief for respondent - cross-petitioner.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Claimant seeks review of an order of the Workers' Compensation Board (Board) that reinstates SAIF's denial of compensation for her thoracic outlet syndrome and the surgery for that condition. SAIF cross-appeals, attacking the Board's ruling that surgery for claimant's cervical condition was compensable. We affirm in part and reverse in part.

On April 3, 1978, claimant suffered a compensable neck injury while participating in a work-related self-defense class. The injury resulted in a time-loss award and a later award for aggravation. *See Nelson v. SAIF,* 49 Or App 111, 634 P2d 245 (1980) (involving this claimant). Even after claimant had filed the claims leading to those awards, her cervical condition continued to worsen. In December, 1979, Dr. Poulson, who had treated her for the original injury, performed a discogram that indicated a rupture at intervertebral discs C4-5 and C5-6. He reported the discogram results to SAIF on December 13, stating that he would probably recommend surgery that would include anterior cervical fusion at both the C4-5 and C5-6 levels.

On January 4, 1980, SAIF notified claimant that it had made an appointment for her with Orthopaedic Consultants in order to obtain a second opinion about (1) whether the cervical disc surgery suggested by Dr. Poulson was "recommended" and (2) whether claimant's "present symptoms" had been caused by the 1978 industrial injury. The appointment was scheduled for February 7, 1980.

Also in late 1979, claimant told Dr. Poulson that she had pain and tingling in her right arm and hand.[1] Dr. Poulson referred her to Dr. Gaiser, a vascular specialist, who diagnosed the arm and hand symptoms as the products of thoracic outlet syndrome. When SAIF learned of Dr. Gaiser's diagnosis, it asked Orthopaedic Consultants to determine at the February 7 examination (1) the relationship between claimant's thoracic outlet syndrome and her compensable injury, (2) whether the diagnosis was correct, and (3) if the diagnosis was correct, whether surgery was desirable.

---

[1] The record indicates that claimant had had such problems for some time but that the symptoms got much worse in late 1979.

Claimant did not keep the February 7 appointment. Instead, she entered the hospital on February 3, and Dr. Poulson performed the cervical operation on February 4. He found degenerated discs at the C4-5 and C5-6 levels and performed an anterior cervical fusion. In the following months, the symptoms from claimant's thoracic outlet syndrome intensified. To correct that problem, Dr. Gaiser performed a transaxillary resection of her first rib on August 11, 1980.

In May, 1980, claimant made a second aggravation claim. By letter dated July 15, 1980, SAIF denied responsibility for her thoracic outlet syndrome, changes in her cervical condition and the medical expenses related to the treatment of both conditions.[2] Claimant sought administrative review and, after a hearing, the referee ordered

"* * * that the denial * * * be set aside and the SAIF Corporation accept as a compensable claim the claimant's cervical and right sided thoracic outlet difficulties and the surgical attention addressed to these difficulties."

The Board affirmed the referee's order with respect to the cervical difficulties but reinstated SAIF's denial with respect to the thoracic outlet syndrome. This appeal and cross-appeal followed.

Claimant contends that the Board erred in holding that she failed to show by a preponderance of the evidence that her thoracic outlet syndrome was compensable. The Board stated:

"With regard to the issue of compensability of claimant's thoracic outlet syndrome, we thus start with the proposition that claimant failed to undergo a reasonable diagnostic procedure [by failing to keep the February 7 appointment] and that this weighs against a finding that claimant sustained her burden of proof. The additional evidence is from both parties' experts, Dr. Gaiser for the claimant and Dr. Norton for SAIF. Dr. Norton was more articulate and informative in his explanation of why he thought the claimant's injury did not cause or aggravate her thoracic outlet syndrome condition. On the other hand,

_____
[2] Claimant had not yet had her thoracic outlet surgery at the time she made this claim. However, the claim stated that her thoracic outlet syndrome would require surgery and requested compensation for all "medical care and treatment" related to that condition.

Dr. Gaiser's opinion is bolstered by the fact that he was the treating surgeon who actually viewed claimant's condition at surgery. The evidence is close to being evenly balanced one way or the other. Considering that claimant had the burden of proof, that claimant's failure to undergo a reasonable diagnostic procedure supports an adverse inference and Dr. Norton's well articulated and cogent reasoning on the subject, we conclude that claimant has not sustained the burden of proving compensability of her thoracic outlet syndrome."

■ ■ Although the question is a close one on the record before us, we conclude that claimant's thoracic outlet syndrome and the surgery are compensable. As the Board recognized, the evidentiary conflict reduces to a difference of opinion between Dr. Gaiser, who believes that claimant's thoracic outlet syndrome was related to the 1978 injury, and Dr. Norton, who does not. Although Dr. Norton's written explanation of his opinion may be somewhat more articulate than Dr. Gaiser's verbal explanation of his conclusion, Dr. Gaiser's explanation is more than adequate.[3] We give his opinion greater weight than Dr. Norton's because of the vast difference in their firsthand exposure to and knowledge of claimant's condition. *Hamlin v. Roseburg Lumber Co.,* 30 Or App 615, 619, 567 P2d 612 (1977). Dr. Gaiser first diagnosed claimant's thoracic outlet syndrome in January, 1979; he saw her several more times in the spring and summer; and he performed the corrective surgery. Dr. Norton, a full-time SAIF consultant, never examined claimant. Furthermore, he admitted that he had not performed thoracic outlet syndrome surgery in 15 years, and he acknowledged that the treatment for that syndrome has shifted in recent years from orthopedists like himself to vascular specialists like Dr. Gaiser. These factors indicate to us that Dr. Gaiser was in a better position than Dr.

---

[3] Dr. Gaiser explained in his deposition that claimant was "predisposed to development of thoracic outlet syndrome" by virtue of certain physical characteristics. He went on to state, however, that:

"In some [predisposed] people that are asymptomatic, it is my opinion and conviction that muscle spasms in the neck from any sort of diffuse neck injury elevates the first rib just enough to produce what once was a relatively free access or regress through this space to one in which the vessels and nerves are in fact compressed."

In his opinion, that is what happened to claimant.

Norton to render an opinion about the cause and progress of claimant's thoracic outlet difficulties.

Unlike the Board, we are not persuaded by SAIF's argument that claimant's failure to keep her February 7 appointment with Orthopaedic Consultants so weakens her proof that it falls below the preponderance of the evidence standard. The Board's decision rested in part on two opinions from this court. *Finley v. SAIF,* 34 Or App 129, 578 P2d 432 (1978), held that the claimant's refusal to submit to a diagnostic test was "a failure to provide evidence which was reasonably available to him" and that his failure "must be regarded as a weakness in his proof" with respect to the extent and duration of his disability. *Suell v. SAIF,* 22 Or App 201, 538 P2d 84 (1975), held that the claimant's refusal to take a myelogram "must be taken into consideration in determining whether claimant has established that he is permanently and totally disabled." We recognize the principle established by those two cases, but we do not think that any "weakness in proof" resulting from claimant's failure to keep the February appointment is serious enough to negate all the factors that make Dr. Gaiser's opinion the more persuasive one.[4] We therefore reverse the Board's order with respect to claimant's thoracic outlet problems. The referee's order on this issue is reinstated.

SAIF assigns as error (1) the Board's finding that claimant's failure to keep the February 7 appointment does not estop her to contend that SAIF is responsible for the surgery and its consequences and (2) the Board's conclusion that, because claimant had a compensable cervical condition, the cervical surgery and its consequences are automatically compensable.[5]

■   With respect to the first assignment of error, we agree with SAIF that neither claimant nor Dr. Poulson has

---

[4] We do not wish to imply that claimants can ignore insurer-requested appointments with impunity. Claimant and Dr. Poulson should have attempted to procure either an earlier appointment or a later surgery date. Their combined failure to do so weighs against claimant, but that weight is not determinative under the facts of this case.

[5] SAIF makes a third assignment of error but does not support the assignment with argument. Its merits are not obvious, and we do not discuss it. *Schmid v. Thorsen,* 89 Or 575, 170 P 930, 175 P 74 (1918).

given a satisfactory explanation why claimant could not have delayed her surgery and kept the appointment.[6] However, claimant's failure does not *estop* her to claim compensability. The elements of estoppel are not present and estoppel is not necessary for a fair resolution of the case.[7]

■ Turning to the second assignment of error, Dr. Poulson stated in his deposition that claimant's 1978 injury was a "material contributing factor" to the cervical problems addressed by his surgery. He also opined that without the surgery, claimant's condition would have continued to deteriorate, leaving her with "more permanent disability than she would [have had] without the surgery." Dr. Norton, on the other hand, did not think that the surgery was a medical necessity and did not see how claimant's 1978 injury could have "caused a permanent worsening of what is generally felt to be a degenerative process." As the referee pointed out, however, Dr. Norton does not distinguish the complaints that prompted Dr.Poulson to perform the discogram and surgery from the complaints held in *Nelson v. SAIF, supra,* to be the product of claimant's compensable injury. We find no basis for reversal of the Board's finding of compensability.

Affirmed in part; reversed in part; referee's order reinstated as to thoracic outlet compensability.

---

[6] Claimant testified that she decided to proceed with the February 4 surgery because she was in pain, she understood that Dr. Poulson had a lengthy vacation scheduled around that time and she did not want to wait until he returned, and she thought—mistakenly—that her "regular" medical insurance would cover the operation if SAIF would not. Dr. Poulson, however, stated that he had no such vacation plans and that her surgery, being elective instead of emergency, could have been rescheduled without difficulty.

[7] OAR 436-54-283(1) requires workers to submit to medical examinations at reasonably convenient times and places when requested to do so by the insurer. Subsection 5 states:

"The insurer * * * requesting consent to suspension of compensation because of a worker's failure or refusal to submit to a medical examination * * * shall apply to the Compliance Division * * *.

"* * * * *."

This rule provides SAIF with a remedy against uncooperative claimants. It did not seek suspension of compensation in this instance.